**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

WALLACE ALAN EDGELL,

          Plaintiff,

v.                               **CIVIL ACTION NO.: 3:14-CV-82
(GROH)**

CAROLYN W. COLVIN,
**Acting Commissioner of Social Security,**

          Defendant.

## REPORT AND RECOMMENDATION

## I.   INTRODUCTION

On July 22, 2014, Plaintiff Wallace Alan Edgell ("Plaintiff"), by counsel Scott A. Curnutte, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1). On October 20, 2014, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an Answer and the Administrative Record of the proceedings. (Answer, ECF No. 5; Admin. R., ECF No. 6). On January 20, 2015, and March 20, 2015, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 10; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 24). Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II. PROCEDURAL HISTORY

On May 20, 2011, Plaintiff filed his first application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB"), alleging disability beginning on August 31, 2009 due to rheumatoid arthritis and high blood pressure. (R. 155-56). Plaintiff's earnings record shows that he acquired sufficient quarters of coverage to remain insured through June 30, 2015; therefore, Plaintiff must establish disability on or before this date. (R. 31). Plaintiff's claim was denied initially on June 9, 2011 (R. 105) and denied upon reconsideration on September 9, 2011 (R. 116). On October 25, 2011, Plaintiff filed a written request for a hearing (R. 119), which was held before United States Administrative Law Judge ("ALJ") Terrence Hugar on November 30, 2012 in Morgantown, West Virginia. (R. 46-94). Plaintiff, represented by counsel Scott A. Curnutte, Esq., appeared and testified, as did Linda Dezack, an impartial vocational expert. (R. 46). On January 4, 2013, the ALJ issued an unfavorable decision, finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 28). On May 23, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 2-6).

## III. BACKGROUND

### A. Personal History

Plaintiff was born on July 27, 1949, and was sixty-one years old at the time he filed his DIB claim. (R. 155). He obtained a Ph.D. in higher education administration and industrial engineering from Texas A&M University in 1983. (R. 53). Plaintiff worked as a clerk for the United States District Court for the Northern District of West Virginia for twenty-three years, from 1986 until 2009. (R. 53-54). From 1988 to May 2010, Plaintiff also taught one class a semester at Davis and Elkins College as an adjunct professor. (R. 62, 189). Starting in June 2010, Plaintiff also

worked part-time (i.e., approximately fifteen hours a week) as the golf coach at Davis and Elkins College.[1] (R. 55-60, 189). He is no longer married and has no dependent children. (R. 155-56).

## B. Medical History

Plaintiff alleged disability due to rheumatoid arthritis, which eventually transitioned into a diagnosis of lupus. (R. 51). Plaintiff also alleged disability due to high blood pressure. (Id.).

### 1. Medical History Pre-Dating Alleged Onset Date of August 31, 2009

On April 27, 2009, Plaintiff presented to an appointment with Dr. Ashton C. Curtis, D.P.M. with his chief complaint being that his "feet hurt." (R. 480-82). Plaintiff reported an aching and burning pain in his heels and balls of both feet especially when he first gets up; he stated the pain goes away as he walks and he has not noticed any swelling. (Id.). He thought it was joint pain but found the pain to be at the balls of his feet and not with range of motion. (Id.). He said the pain had been present for a few months and Motrin or Aleve helps "just a little bit." (Id.). Dr. Curtis noted normal appearing feet with no erythema or edema. (Id.). Dr. Curtis followed-up with Plaintiff on May 6, 2009, on which he reported that the Aleve seemed to be helping and his feet were not nearly as painful. (R. 482).

On March 16, 2009, Plaintiff presented for an appointment for hypertension with Dr. Chua, his primary care physician. (R. 251). The physical examination was normal and the review of

---

[1] On May 23, 2011, E. Armentrout, an SSA interviewer, completed a Work History Report. (R. 177-84). In regard to Plaintiff's position as an adjunct professor, he found that Plaintiff averaged three hours per week and earned $1,500.00 per semester for an average of $300.00 per month (one semester lasts five months) from August 2009 to May 2010. He found that this position did not qualify as substantial gainful activity. (R. 184). As for Plaintiff's golf coach position, the SSA interviewer found that Plaintiff started work in June 2010, worked fifteen hours per week and earned $10,000.00 per year, which averaged $833.99 per month. Armentrout similarly found that this did not qualify as substantial gainful activity. (Id.). Plaintiff further represented to the ALJ that in 2012, Plaintiff only earned $963.63 per month to date. (R. 33). In his decision, the ALJ concluded that "[i]n resolving any and all benefit of the doubt in the claimant's favor, the Administrative Law Judge has accepted this argument" and found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of August 31, 2009. (Id.).

systems was negative for all areas, including musculoskeletal. (Id.). Plaintiff's diagnosis was hypertension and hyperlipidemia. (Id.).

On May 15, 2009, Plaintiff had a follow-up appointment with Dr. Chua. (R. 253). Plaintiff reported "pretty severe" hand and foot pain about four weeks prior but noted the pain "seems to be getting a little better." (Id.). Otherwise, Plaintiff's review of systems and physical examination were normal. (Id.). Diagnoses included joint pain, multiple joints and hypertension, benign. (Id.).

On June 4, 2009, Plaintiff presented for a follow-up of arthritis and reported continued swelling and pain in his feet and hands that is worse in the morning and gets better later in the day. (R. 254). He reported "feeling a little better" and stated that "nothing else" was going on. (Id.). Plaintiff's physical examination was normal except for the extremity problems reported. (Id.). His diagnosis was arthropathy, unspecified, and he was prescribed Naprosyn, nonsteroidal anti-inflammatory medicine. (Id.).

On July 8, 2009, Plaintiff followed-up with Dr. Chua and still had swollen hands and ankles. (R. 255). Plaintiff was seeking "some relief" while awaiting his appointment with Dr. Kafka, a rheumatologist. (Id.). Dr. Chua prescribed a longer prednisone taper. (Id.).

**2. Medical History Post-Dating Alleged Onset Date of August 31, 2009**

On September 14, 2009 Plaintiff presented for an appointment with Dr. Chua and reported that he was doing better, his joints were less swollen and he had no new major problems. (R. 256). His review of systems and physical examination were normal. (Id.). His diagnosis was arthropathy, unspecified, and he was prescribed Lovaza and Diovan for his heart conditions, Vitamin D and Plaquenil/hydroxychloroquine sulfate, which is used to treat symptoms of rheumatoid arthritis and systemic lupus. (Id.).

On October 12, 2009, Plaintiff had a follow-up appointment with Dr. Chua. (R. 257). Plaintiff reported mild pain but no swelling in his hands. (Id.). He stated he was "feeling pretty good" and noted that the "cold bothers his hands but nothing else." (Id.). His diagnoses were unspecified crystal arthropathy and other abnormal glucose. (Id.). Plaintiff had tapered off his prednisone and Dr. Chua continued the Plaquenil prescription. (Id.).

On December 11, 2009, Plaintiff reported to Dr. Chua that he was doing better and was diagnosed with sero-negative rheumatoid arthritis but otherwise felt okay. (R. 258). His physical examination was normal and diagnoses included systemic rheumatoid arthritis, hypertension and hyperlipidemia. (Id.).

On April 4, 2010, Plaintiff presented to Elkins Physical Therapy and Sports Injury Clinic for an appointment with Vanessa Reed, DPT. (R. 286). Plaintiff reported playing golf and injuring his hand when he lost his balance. (Id.). Plaintiff went to the ER, x-rays showed a scaphoid fracture and he was given a cast for two weeks and then a brace for six weeks. (Id.). Plaintiff stated he played golf after the injury and reported pain on the ulnar side that is localized with certain movements and he "knows when he is over doing it." (Id.). The objective examination showed decreased flexibility of the common wrist flexor. (Id.). Plaintiff's problem list included decrease range of motion, decrease strength, decrease grip strength and decrease flexibility of the left wrist. (Id.). The plan included eight weeks of physical therapy with goals to improve range of motion and strength and regain comfort with golf in four weeks. (Id.). On April 16, 2010, Plaintiff had a physical therapy evaluation for discharge at Elkins Physical Therapy. (R. 285). Plaintiff reported returning to playing a full eighteen holes of golf without change in left wrist pain. (Id.). He stated he still experienced tightness in the morning, but it was not a problem. (Id.). The assessment noted Plaintiff had been seen at total of three times for joint mobilization and instruction in flexibility

and strengthening of the left wrist and he had met all goals and ready for discharge with no further treatment necessary. (Id.).

On June 30, 2009, Dr. Chua referred Plaintiff to the Rheumatology and Osteoporosis Clinic with Dr. Shelly P. Kafka, MD, a rheumatologist, due to swollen feet and hands. (R. 335).

On August 6, 2009, Plaintiff presented to his referral appointment with Dr. Kafka. (R. 288). Plaintiff reported that he suddenly awoke with pain and swelling in the bottom of his feet, particularly around his MTP joints. (R. 291). Soon after, he developed significant swelling and pain in his fingers. (Id.). Plaintiff stated that he took prednisone, which helped all of the symptoms go away with no further problems. (Id.). He noted that his third and fourth toes bilaterally have a sensation of numbness. (Id.). Plaintiff denied any other symptoms and denied being ill prior to the development of the swelling in his extremities. (Id.). His past medical history at this time included hypertension and GERD. (R. 292). The review of systems was normal except for positive findings for hypertension, swelling in his legs and feet, heartburn and sensitivity or pain in his hands and feet. (R. 292-93). The physical examination was normal and noted good strength in all extremities and normal reflexes. (R. 294). The musculoskeletal examination was within normal limits and showed good range of motion in all areas. (Id.). The diagnosis was inflammatory arthritis and Dr. Kafka noted "[i]t is not clear at this point whether he is in pre-clinical stages of rheumatoid arthritis or perhaps whether this was a viral syndrome. Given his symptoms though, he will need to be monitored carefully." (R. 295).

On August 14, 2009, Dr. Kafka sent Plaintiff a letter notifying him that all laboratory studies, x-ray reports and other diagnostic testing were normal. (R. 340).

On August 26, 2009, Dr. Kafka ordered an x-ray of Plaintiff's left and right hands due to polyarthritis and bilateral hand pain. (R. 383-84). Both x-rays showed mild osteopenia with no significant changes and no acute bony abnormality. (Id.).

On December 11, 2009, Plaintiff returned to Rheumatology and Osteoporosis Clinic for a follow-up visit with Dr. Kafka. (R. 288). Plaintiff complained of pain and swelling in his fourth toe bilaterally. (R. 289). The review of systems and physical examination were normal but the musculoskeletal exam noted abnormalities in his MCPs. (R. 290). Plaintiff had a questionable rheumatoid arthritis diagnosis at this time. (Id.).

On January 7, 2010, Plaintiff presented to the Gessler Clinic in Florida for an appointment with Dr. Maurice F. McCarthy, Jr., M.D. to establish ongoing care for his rheumatoid disease. (R. 372). His past medical history included morning stiffness for approximately one hour and difficulty with weather change although no significant difficulty with current and recurrent freezing weather over the past few days; however, he did have a significant flare with colder weather prior to leaving West Virginia. (R. 371). Dr. McCarthy noted "classic onset suddenly and overnight with MTPs and MCPs" with resolution of symptoms on prednisone except for residual left second toe symptoms. (Id.). After steroid therapy, Plaintiff showed extensive symptomatology with numbness in the left and fourth toe but ongoing recurrent and mild swelling about the second and third MCP of each hand. (Id.). The review of systems, rheumatologic review of systems and physical examination were normal except for synovial hypertrophy without warmth or tenderness in his third MCPs in his right hand. (R. 373). The diagnoses included: rheumatoid arthritis (initial rheumatoid factor and anti-CCP negative with elevated CRP); history of vitamin D insufficiency; hypertension; gastroesophageal reflux and hyperlipidemia. (Id.). Dr. McCarthy continued Plaintiff's Osteo Bi-Flex and Plaquenil prescriptions and started methotrexate. (Id.).

On February 19, 2010, Plaintiff returned to Dr. McCarthy's office for a re-check and reported feeling "quite well at this time." (R. 370). Plaintiff's review of systems and rheumatologic review of systems and physical examination were negative. (Id.). Dr. McCarthy noted no morning stiffness or joint swelling and that Plaintiff appeared to be in remission at this time. (Id.). His diagnoses remained unchanged from his prior visit but also included hyperuricemia, without prior history of gout, and arteriosclerosis. (Id.).

On March 30, 2010, Plaintiff returned to Gessler Clinic and reported doing well with no joint swelling and was in "complete remission at this time." (R. 366). The review of systems, rheumatologic review of systems and physical examination were negative. (Id.). His diagnosis was rheumatoid disease in remission at this time and he remained on methotrexate and hydroxychloroquine. (Id.).

On July 8, 2010, Plaintiff presented for an appointment with Dr. Kafka. (R. 283). Plaintiff reported doing well at this time and had a little morning swelling. (Id.). He stated that Dr. Franz diagnosed him with psoriasis and he has spots on the back of his head and left ankle. (Id.). The review of systems, physical examination and musculoskeletal exam were normal. (R. 284, 333). His diagnosis included psoriasis at this time. (R. 334).

On October 5, 2010, Plaintiff presented to an appointment with Dr. Kafka reporting pain in his toes on both feet and that his fourth toe hurts when walking. (R. 280). Plaintiff stated the pain was better when on prednisone but since off the medication, it has gotten worse. (Id.). He reported no other joint pain, no psoriasis and doing well on methotrexate. (Id.). He stated that he golfs every day and planned on going to Florida after Christmas. (Id.). Plaintiff's review of systems and physical examination was normal; his musculoskeletal exam noted his fourth toe was tender,

bilaterally. (R. 280-81). His diagnosis was inflammatory arthritis: rheumatoid arthritis versus psoriatic arthritis; Dr. Kafka recommended continuing methotrexate. (R. 281).

On November 15, 2010, Plaintiff had an x-ray of his right foot which showed no facture and good alignment. (R. 358). An x-ray of the left foot was also negative. (R. 359).

On January 5, 2011, Plaintiff had an appointment with Dr. Kafka and reported not feeling as well with the weather change and that his hands were stiff and swollen for four to five weeks. (R. 277). The musculoskeletal exam showed normal findings except for his metacarpophalangeals ("MCPs") and his knees. (R. 278). His diagnosis was rheumatoid arthritis – doing well. (R. 328).

On March 14, 2011, Plaintiff presented for a follow-up appointment with Dr. Chua and reported doing "okay." (R. 259). He stated that he takes Tylenol three times a day and this his rheumatoid arthritis symptoms "really keep him from playing golf like he would want to do" and that he is "very stiff in the afternoons." (Id.). His review of symptoms and physical examination were otherwise normal and his diagnosis was rheumatoid arthritis. (Id.).

On May 10, 2011, Plaintiff presented to an appointment with Dr. Kafka and reported that he has one good day a week and does not think the methotrexate is working. (R. 324). He reported not sleeping well, that his knees "freeze up" after sitting and that he experiences pain and stiffness after exercise or movement. (Id.). The review of systems and physical examination were normal but the musculoskeletal exam showed swelling and tenderness in the MCPs and PIPs as well as tenderness bilaterally in Plaintiff's knees and ankles with mild swelling in his knees. (R. 325). Plaintiff's diagnosis was rheumatoid arthritis. (Id.).

On May 16, 2011, Plaintiff presented to Elkins Express Care for cold symptoms and the physical examination showed normal findings, including no problems with muscle weakness or reduced range of motion. (R. 306-08).

On August 10, 2011, Plaintiff had an appointment with Dr. Kafka and reported feeling well with no current pain. (R. 313). He stated he had occasional stomach pain on the left side when he breathes and also occasional right knee problems. (Id.). He reported playing and coaching golf. (Id.). The review of systems, physical examination and musculoskeletal examination were normal. (R. 313-14). His diagnoses were rheumatoid arthritis and mild leukopenia. (R. 314).

On August 29, 2011, Plaintiff presented to Elkins Express Care for a routine medical exam with Dr. Timothy Peasak. (R. 430). Plaintiff stated his hiatal hernia was acting up, he had head congestion, nausea and increased indigestion and sore throat from reflux the last few days. (Id.). Plaintiff had no other complaints. (Id.). The physical examination was normal and noted no significant pain. (R. 401). His diagnosis was esophageal reflux and Dr. Peasak referred Plaintiff to GI for an endoscopy. (Id.).

On September 23, 2011, Plaintiff presented for a follow-up appointment with Dr. Chua due to weight loss and experiencing sharp abdominal pain that lasts for days and hurts worse when he takes a deep breath, sneezes, coughs or has hiccups. (Id.). His review of symptoms was negative, physical examination normal and diagnoses included rheumatoid arthritis and hypertension. (Id.).

On October 17, 2011, Plaintiff called Dr. Kafka's office and stated that he had seen his dermatologist, Dr. Franz, who diagnosed Plaintiff with lupus. (R. 403). Plaintiff had broken out all over with a rash and had very sore spots on his back; he also reported that it hurt to take a deep breath. (Id.). He was given a cream but it was not helping. (Id.).

On October 21, 2011, Plaintiff presented for an appointment with Dr. Kafka with a rash, sore spots all over and reporting becoming increasingly tired. (R. 411). The review of systems noted fatigue, the physical examination noted rashes on his face, arms, chest and back, and the musculoskeletal exam was normal. (Id.). Dr. Kafka diagnosed Plaintiff with lupus; he further noted

that Plaintiff had been diagnosed with rheumatoid arthritis and then psoriasis but "this was likely erroneous" and that he "had lupus all along." (R. 412). His other diagnoses included pleuritic, fatigue and leukopenia. (<u>Id.</u>).

Also on October 21, 2011, Plaintiff had an appointment with Dr. Chua and explained that he had seen Dr. Kafka who diagnosed him with lupus, not rheumatoid arthritis. (R. 435). He stated that he was on Plaquenil and prednisone and "feeling a little better right now." (<u>Id.</u>). The review of systems and physical examination were normal. (<u>Id.</u>). His diagnoses included systemic lupus erythematosus and hypertension, benign. (<u>Id.</u>).

On October 31, 2011, Plaintiff presented for a follow-up with Dr. Chua for lupus. (R. 436). Plaintiff reported doing okay, that his costochrondral pain was back but not too bad and he was going to try to exercise. (<u>Id.</u>). The review of symptoms and physical examination were normal. (<u>Id.</u>). His diagnoses remained unchanged. (<u>Id.</u>).

On November 3, 2011, Plaintiff had a routine medical exam with Dr. Peasak. (R. 429). His medications at the time included aciphex, aspirin, centrum, diovan, folic acid, lovaza, methotrexate, Nexium, osteo bi-flex, Tylenol 650mg, vitamin D, Zyrtec and embrel. (<u>Id.</u>).

On November 15, 2011, Plaintiff had an appointment with Dr. Kafka where he reported pain with deep breathing, yawning and sneezing. (R. 408). Plaintiff stated his sleep improved with melatonin and that the prednisone helped his pain go from a ten to a four. (<u>Id.</u>). Plaintiff further reported that he was unable to pull back the bow on his cross bow and that it hurt his arm and fingers. (<u>Id.</u>). The review of systems was negative, the physical examination noted a scab from the rash on his right mid/lateral back, and the musculoskeletal exam was normal. (R. 408-09). His diagnosis was lupus with rash, improved. (R. 409).

On November 23, 2011, Plaintiff underwent an esophageal biopsy due to gastrophageal reflux disease and dysphagia. (R. 434). The procedure showed a small hiatal hernia in the esophagus. (Id.).

On February 14, 2012, Plaintiff presented to an appointment with Dr. Kafka and reported feeling better and his rash improving but still experiencing pain in his chest. (R. 405). The review of systems noted fatigue and pleuritis (pain with deep breathing). (Id.). The physical examination was normal except for a rash on his back. (Id.). The musculoskeletal examination was normal. (R. 406). His diagnoses at this time included lupus with likely pleuritic and rash, much improved. (Id.).

On February 15, 2012, Plaintiff had a follow-up with Dr. Chua for lupus. (R. 437). He reported improving, taking a little Aleve, his rash resolved, arthritis improved and his lupus "has really improved" on his current medications. (Id.). He stated that Dr. Franz did a biopsy the week prior to determine whether he has lupus or rosacea. (Id.). The review of symptoms was negative and physical examination normal. (Id.). His diagnosis was systematic lupus erythematosus. (Id.). Dr. Chua noted that Plaintiff was "responding nicely to the Plaquenil." (Id.).

On April 9, 2012, Plaintiff returned to Dr. Chua's office for a general medical appointment. (R. 438). Plaintiff reported no new major issues, he had a little dermatitis on his hands from the sun and stated that he had been able to play some golf. (Id.). His review of symptoms was negative, physical examination normal and diagnoses remained unchanged. (Id.).

On May 21, 2012, Plaintiff presented to an appointment with Dr. Kafka and reported doing well and that the pain was "okay right now." (R. 468). He explained that he can no longer work "in season" like he was before, he cannot travel like he used to and cannot handle the sun exposure. (Id.). His review of systems noted fatigue and the physical examination noted bright erythema over

his fingers and hands and speckled up his arms. (R. 469). His diagnosis was lupus with increase rash. (Id.). He was prescribed MDP and directed to follow-up in one week. (Id.).

On May 30, 2012, Plaintiff followed up with Dr. Kafka after being placed on MDP medication. (R. 460). Plaintiff stated he finished on May 28 and noticed a slight difference. (Id.). He said he had been avoiding the sun a little more, using more SPF and wearing a hat. (Id.). The review of systems was negative and physical examination normal except for erythema on his hands. (Id.). Plaintiff's diagnosis was lupus with sun sensitivity due to medication. (R. 467).

On July 16, 2012, Plaintiff had an appointment with Dr. Chua and reported doing "okay." (R. 447). His review of symptoms and physical examination were normal and diagnoses remained unchanged. (Id.).

On October 3, 2012, Plaintiff presented to Dr. Kafka's office and reported feeling "great" with no pain or other concerns. (Id.). His redness improved after stopping doxycycline and he also stated that he would be resigning as golf coach for Davis-Elkins after this year. (Id.). His review of systems was negative and physical examination normal except for metatarsophalangeal articulations ("MTPs"). (R. 465). His diagnoses were lupus and rash, improved. (Id.).

### 3. Medical Reports/Opinions

#### a. Physical RFC, Ferdad Roidad, Single Decisionmaker, June 8, 2011

On June 8, 2011, Ferdad Roidad, a single decision maker ("SDM"), completed a physical residual functional capacity assessment of Plaintiff. (R. 95-102). Plaintiff's primary diagnosis was rheumatoid arthritis with a secondary diagnosis of hypertension. (R. 95).

Plaintiff was limited to occasionally lifting twenty pounds, frequently lifting ten pounds, standing/walking about six hours a day, sitting for about six hours a day and unlimited pushing and pulling. (R. 96). As for postural limitations, due to Plaintiff's rheumatoid arthritis, Mr. Roidad

limited Plaintiff to occasionally climbing ramps/stairs, balancing, stooping, kneeling and crouching and never climbing ladders, ropes or scaffolds and crawling. (R. 97). Mr. Roidad found no manipulative, visual or communicative limitations. (R. 98). For environmental limitations, Mr. Roidad noted that Plaintiff should avoid concentrated exposure to extreme heat, wetness, vibration and hazards, such as machinery and heights; should avoid even moderate exposure to extreme cold; and may have unlimited exposure to humidity, noise and fumes, odors, dusts, gases, poor ventilation, etc. (R. 99).

Mr. Roidad discussed the symptoms alleged by Plaintiff including reports of continuous pain with severe pain during flare-ups that occur six to seven months during the year and result in immobilization. (R. 100). Mr. Roidad found Plaintiff's statements to be "mostly credible as he has documented rheumatoid arthritis." (Id.). Mr. Roidad further noted that Plaintiff's exams have been unremarkable and his pain well-controlled until recently. (Id.). He also noted that Plaintiff coaches golf, performs personal care tasks and is able to shop and drive when he is not having a flare-up. (Id.). In conclusion, Mr. Roidad stated that the "light RFC with postural and environmental limitations is appropriate." (Id.).

On September 8, 2011, Fulvio Franyutti, M.D., a specialist in pathology, reviewed the medical evidence in the case file including updated evidence and activities of daily living. (R. 401). Based on consideration of the record, he affirmed the June 8, 2011 assessment. (Id.).

### 4. New Evidence Submitted to the Appeals Council

#### a. Lupus (SLE) Medical Source Statement, Dr. Kafka, M.D., April 10, 2013

On April 10, 2013, Dr. Shelly Kafka, Plaintiff's treating rheumatologist, completed a Lupus (SLE) Medical Source Statement regarding Plaintiff's impairments. (R. 502-04). Dr. Kafka listed osteoarthritis as another one of Plaintiff's diagnoses. (R. 502). In order to fulfill the diagnosis

criteria for systemic lupus erythematosus (SLE), a patient must meet at least four signs or symptoms. As for objective signs of Plaintiff's impairment, Dr. Kafka noted: 1) photosensitivity due to medication; 2) non-erosive arthritis involving pain in two or more peripheral joints as well as tenderness of the joints, the affected joints being Plaintiff's feet and hands; 3) anti-DNA or anti-Sm anti-body or positive finding on antiphospholipid antibodies; 4) positive test for ANA at any point in time; 5) constitutional symptoms include severe fatigue; and 6) occasional flares of joint pain. (R. 502-03). Dr. Kafka also stated Plaintiff had inflammatory arthritis, at least to a moderate degree. (R. 503). Dr. Kafka further noted that emotional factors did not contribute to the severity of Plaintiff's symptoms. (R. 504). Dr. Kafka listed Plaquenil as Plaintiff's medication and listed no side effects. (Id.). She stated that Plaintiff's prognosis was stable and that his impairments were expected to last at least twelve months. (Id.). As for functional limitations, Dr. Kafka noted that a functional capacity evaluation should be completed by a physical therapist. (Id.).

### b. Lupus (SLE) Medical Source Statement, Dr. Catherine Chua, May 28, 2013

On April 10, 2013, Dr. Chua, Plaintiff's treating physician, completed a Lupus (SLE) Medical Source Statement regarding Plaintiff's impairments. (R. 508-12). As for length of treatment relationship, Dr. Chua stated that he treated Plaintiff every three months for ten years. (R. 508). Plaintiff's other diagnoses included hypertension, GERD, hyperlipidemia and gonadal dysgenesis. (Id.). Dr. Chua's findings regarding positive objective signs of Plaintiff's impairment included: 1) malar rash (over the cheeks); 2) non-erosive arthritis involving pain, tenderness, swelling and effusion in more than one joint; 3) cardiopulmonary involvement shown by pleuritic; 4) anti-DNA or anti-Sm antibody or positive finding of antiphospholipid antibodies; 5) positive test for ANA; 6) severe fatigue; and 7) body system involvement, at least to a moderate degree, of Plaintiff's respiratory system (i.e., pleuritic), inflammatory arthritis and skin. (R. 508-09). Dr.

Chua found moderate functional limitations for activities of daily living, maintaining social functioning and completing tasks in a timely manner due to deficiencies in concentration, persistence or pace. (R. 509). He found no emotional factors contributing to Plaintiff's symptoms or limitations. (Id.). Dr. Chua noted that Plaintiff's prognosis was good and his impairments were expected to last twelve months. (R. 510).

As for functional limitations, Dr. Chua found Plaintiff could walk three city blocks before needing to rest, could sit for thirty minutes at one time before needing to get up, could stand for fifteen minutes at one time before needing to sit down or walk around, and could sit and stand/walk for a total of about four hours in an eight-hour work day. (Id.). He noted that Plaintiff would need a job that permitted shifting positions at will from sitting, standing or walking. (Id.). He noted that Plaintiff would sometimes need to take unscheduled thirty minute breaks every two hours during the work day, in which Plaintiff could lie down. (Id.).

Dr. Chua limited Plaintiff to never lifting or carrying fifty pounds, rarely carrying twenty pounds (i.e., one to five percent of an eight hour day) and occasionally carrying ten pounds and less than ten pounds (i.e., six to thirty-three percent of an eight hour day). (R. 511). He found Plaintiff could never climb ladders, rarely climb stairs, occasionally stoop (bend), occasionally crouch/squat and frequently twist. (Id.).

For environmental restrictions, Dr. Chua found no restrictions on perfumes, soldering fluxes or solvents/cleaners and recommended to avoid concentrated exposure to high humidity, and wetness and to avoid even moderate exposure to extreme cold, extreme heat, cigarette smoke, fumes, odors, gases, dust and chemicals. (Id.).

Dr. Chua noted that Plaintiff would likely be "off task" twenty-five percent or more of the time and would be incapable of even "low stress" work because that is the reason he needed to

16

resign from his job. (R. 512). He further noted that Plaintiff's impairments were likely to produce good and bad days. (Id.). He further stated that if working full time, Plaintiff would likely be absent from work as a result of his impairments more than four days per month. (Id.).

### c. Functional Capacity Evaluation, John DiBacco, PT, DPT, Elkins PT and Sports Injury Clinic, June 15, 2013[2]

On June 15, 2013, John DiBacco completed a Functional Capacity Evaluation of Plaintiff after he was referred by his treating physician, Dr. Chau. (R. 15-18). Mr. DiBacco found Plaintiff could perform lifting at the light physical demand level for an eight hour day with significant restrictions on his ability to tolerate repetitive material handling or prolonged activity. (R. 15). He acceptable leg lift and torso lift capability was ten pounds. (Id.). Dr. DiBacco opined that due to these restrictions, Plaintiff "could be classified as unable to work unless significant job modifications could be made." (Id.).

In support of this assessment, Mr. DiBacco discussed Plaintiff medical history and treatment starting with his rheumatoid arthritis diagnosis four years prior which eventually developed into his lupus diagnosis. (R. 15). He noted that Plaintiff reported continued soreness in his hands, elbows, shoulders and feet, swelling into his hands and feet as well as persistent fatigue at all times and little stamina. (Id.). Plaintiff further stated that "he has been cleared to start building his strength" as he primarily has been sitting for most hours of the day for the past two years. (Id.).

The musculoskeletal examination showed normal sensation to light touch through both upper and lower extremities. (R. 16). He reported pain with trunk motion and the following range of motion limitations: flexion, twenty degrees; extension, fifteen degrees; right SB, twenty

---

[2] This evaluation was not incorporated into the record by the Appeals Council because it was found to be "about a later time." (R. 3). As discussed below, Plaintiff contends the Appeals Council erred in failing to consider the physical therapy evaluation.

degrees; and left SB, twenty degrees. (Id.). Plaintiff reported "a pulling sensation in his low back with flexion and side bending felt from the lower thoracic region through the lumbar paraspinals." (Id.). There was also some pain extending down to the right greater trochanter. (Id.). His supine straight leg raise was limited to thirty-five degrees on the left and right with tightness through the posterior leg into the low back. (Id.). Mr. DiBacco noted tightness into both hips with external rotation being limited to thirty-two degrees on the right and thirty-five degrees on the left. (Id.). He had good motion at the knees. (Id.). Manual muscle testing of the shoulders showed strength at 4/5 for flexion, ABD and ER with Plaintiff reporting a feeling as though they would not "loosen up." (Id.). There was general pain through both elbows as well as a limited range of motion in both shoulders. (Id.). For occasional material handling, Plaintiff was able to handle weights in the range of nine to twenty pounds; for frequent material handling, Plaintiff was able to handle weights in the range of six to fourteen pounds; for constant material handling, Plaintiff would be able to handle weights in the range of three to seven pounds. (Id.).

The Functional Capacity Evaluation listed that Plaintiff could occasionally lift ten pounds and occasionally carry or push/pull up to twenty pounds. (R. 18). He was limited to occasional bending, squatting, kneeling and occasional stair climbing with no ladder climbing or crawling. (Id.). As for repetitive and static work ability, Mr. DiBacco limited Plaintiff to occasional sitting, standing and walking with frequent forward and overhead reaching; which would equate to thirty minutes of prolonged activity/positioning. (Id.). He had good balance skills. (R. 17, 18). Forward and overhead reaching could be performed on a frequent basis but he may show increased joint pain with repetitive use of the upper extremities. (R. 17). He could do light arm and leg controls. (R. 18). He demonstrated good fine motor skills when working with small objects and good grip and pinch strength. (R. 17). Mr. DiBacco concluded:

Overall, Wally would be able to perform lifting consistent with a LIGHT PDC level. There are continued restrictions on his ability to perform distant lifting to the front or to overhead. He would have difficult [sic] with task involving any type of repetitive squatting or bending at the waist. His limited tolerance to prolonged sitting or standing would make even SEDENTARY work difficult to tolerate on a consistent basis. In light of his limited tolerance to non-material handling tasks, he could be classified as being UNABLE TO WORK unless significant job modifications could be made. There is continued multi joint pain which may make consistent, full days of work difficult to tolerate.

(R. 17).

## C.    Testimonial Evidence

At the ALJ hearing held on November 30, 2012, Plaintiff testified that he received a Bachelor of Arts degree in elementary education and social sciences from Fairmont State, a Master of Arts degree in education administration and a Ph.D. in higher education administration and industrial engineering from Texas A&M University in 1983. (R. 52-53).

Plaintiff worked as a clerk for the United States District Court in the Northern District of West Virginia for twenty-three years, from 1986 to 2009. (R. 53-54). Plaintiff testified that his work as a clerk involved administrative and management duties, lifting less than ten pounds on an average day but occasionally lifting or moving heavier items, such as computers, desk or other items, as well as traveling with the judges on a weekly basis. (R. 54). Plaintiff retired from the position but did not attribute his retirement to his medical conditions; Plaintiff stated that he "wasn't feeling that bad" when he left the court "except for the feet and the traveling and so forth was getting to me." (R. 72). Plaintiff stated he initially planned on working as a consultant following his retirement but due to his declining health in the fall of 2009 he decided not pursue consultant work. (R. 72).

After filing his application for disability, Plaintiff worked as a golf coach at Davis and Elkins College on a part-time basis. (R. 55). Plaintiff explained that his job duties and

responsibilities as a golf coach changed over time due to his declining health. (Id.). Plaintiff explained that at first his position required teaching players, following them on the golf course in a golf cart and working with them at tournaments, which would require travel every weekend for five or six weekends in the fall and four or five weekends in the spring. (R. 55-56). Plaintiff testified that "it got to a point" where he was unable to keep up with the job's duties and the college hired an assistant to "do all the driving and carrying and so forth." (R. 56). Plaintiff then explained that his condition got worse, so the college hired a second assistant coach. (Id.). Plaintiff stated that he no longer does any traveling or driving because he "can't do it." (Id.).

Now, Plaintiff's primary role as a golf coach involves administrative work, such as corresponding with the league, teaching at the academy, lining up tournaments, booking hotels and conducting basic computer work. (R. 56, 81). Plaintiff said he spends a couple hours a week instructing students, which he can do while sitting. (R. 56). He further stated that while instructing he will do some demonstrations, such as putting and chipping. (R. 81). He stated that since the fall of 2012 he has seldom been on the course for practice or tournaments and that an assistant coach has taken over those duties. (R. 57). Plaintiff further explained that the real difficulty is traveling, getting in and out of the van and driving long distances, often up to six or seven hours. (R. 57, 60). He stated that when on the course, he is able to be in a golf cart and "walk around with the boys some." (Id.). Plaintiff then explained the seasons he works as a "split" season that includes four to five tournaments in the fall and three to four in the spring; he attends the tournaments in the fall and spring but the assistant coaches do all the driving and lifting water coolers, clubs and other items. (R. 58). During the summer, he does not have duties involving the golfers but he does prepare for the next fall season, including scheduling, hotels and purchasing things. (Id.). Plaintiff

testified he is paid $12,000 to $13,000 a year for the part-time position. (R. 59). He also stated that at the end of the 2012 season in April/May, he would be retiring as golf coach. (R. 82).

Plaintiff testified that he also worked as an adjunct professor at Davis and Elkins College teaching one semester a year starting in the late 1980s. (R. 61-62). He last worked in the fall of 2009 when he started having problems with his feet and hands. (R. 61). He stated that the position did not require lifting but did require being on his feet and preparation for class. (Id.).

Plaintiff further testified regarding his impairment and medications. Plaintiff explained that his medical condition began to decline in the spring of 2009. (R. 62). Plaintiff first noticed that his feet hurt more than normal and he could not stand for very long in the classroom. (R. 63). He went to see Dr. Curtis and began taking Aleve or Advil for the pain, which helped some but eventually failed to ease the pain. (Id.). His symptoms continued to get worse including swelling in his hands and feet. (Id.). Plaintiff said he at first attributed the symptoms to be a normal part of old age but it got to the point where he could no longer stand it. (Id.). He then sought treatment with Dr. Chua, his family doctor, who referred Plaintiff to a rheumatologist, Dr. Kafka. (R. 64). Dr. Kafka diagnosed Plaintiff with rheumatoid arthritis and started him on prescription medication but his condition continued to get worse. (Id.). Plaintiff then tried a progression of medications, including methotrexate and Enbrel, which involved giving himself a shot once a week. (Id.). Plaintiff explained that his symptoms during this time included swollen and sore hands, knees and feet and occasionally shoulders and painful joints. (R. 66). He also testified that the worse pain ran down his sides, which affected his sleep. (R. 67). Plaintiff stated that he also experienced fatigue at times but there were certain days when he felt fine. (Id.). Plaintiff testified that he experienced flare-ups about once every three weeks or once every month during which he "couldn't do anything." (R. 68). Plaintiff stated he never knew when a flare-up was going to hit and when it did, it was "like

21

knives…in your sides and I couldn't get out of bed." (Id.). The flare-ups typically lasted a couple of days at most. (Id.).

In 2011, Plaintiff began developing a rash all over his body and sores on his back. (R. 64). He returned to Dr. Kafka's office who informed Plaintiff that he had been "misdiagnosed" and he in fact had lupus. (Id.). Plaintiff stated that Dr. Kafka explained that the rheumatoid arthritis symptoms had masked lupus, which includes multiple symptoms and results in flare-ups. (R. 64-65). Dr. Kafka placed Plaintiff on a new medication called Plaquenil and steroids. (R. 65). Plaintiff also regularly takes Aleve to manage pain. (R. 69). Plaintiff explained that now is main problem is swelling in his hands and feet and managing the flare-ups. (R. 65). Plaintiff testified that following his lupus diagnosis and adjustment of medication that the flare-ups do not last as long as before and occur once a month at most. (R. 69-70). However, he stated that while the Aleve and medications help with the pain, when the flare-ups hit particularly bad, he has to lie down. (R. 70). Plaintiff testified that physical activity and exertion exacerbate the problems even though he does not do much physical activity anymore. (Id.). Plaintiff further stated that he starts to experience pain swelling and cramping in his hands even after light physical activity. (R. 70-71). For example, Plaintiff stated that his hands hurt after using the computer for about an hour and he recently had to quit putting together a coffee table when using a screwdriver. (R. 71).

Plaintiff also testified regarding his average daily activities, which he said vary depending on how he is feeling. (R. 76). Plaintiff explained that if he is feeling alright, he will wake up at 8:00 a.m., do errands around town, come home for lunch and to relax, then go to the college to visit with the boys at the academy for about two hours a day and then come home in the evening. (R. 76-77). As for hobbies and interests, Plaintiff testified that he gave up deer hunting a couple years prior but tried hunting last year, which "worked out okay," but he was unable to hunt this

year. (R. 77). In regard to golfing, Plaintiff testified that he had not played for a few months but the past summer there was a week or two that he could play about five times a week. (Id.). Plaintiff said his ability to play golf depends on whether he was experiencing a flare-up or if his hands were swelling. (R. 78). Plaintiff testified that he was planning to travel to Florida two to three weeks prior to Christmas and staying for approximately two months. (R. 79).

Plaintiff's attorney asked what Plaintiff thinks prevents him from returning to work similar to the clerk position (i.e., sedentary work). (R. 72-73). Plaintiff testified to two things: duration and reliability. (R. 73). Plaintiff explained that he is not sure "how long I could do it" and that "there's just days I couldn't do it." (Id.). He estimated that he would not be able to work five days a month. (Id.). Plaintiff further testified that he is also concerned about his ability to stay focused and work at the same level of pace and production as he did previously. (Id.). Plaintiff stated he is not able to stay on his feet for a long time, perhaps ten to fifteen minutes before needing to sit down and take a rest. (R. 74-75). As for sitting, Plaintiff testified that he could sit for about an hour or so before needing to get up and move around. (R. 75). In regard to walking, Plaintiff said he tries to exercise per his doctor's instruction and can walk for about twenty minutes before needing to take a break. (Id.). He used to have problems climbing stairs but is okay now with medication. (R. 75-76). He is limited to driving just a couple of hours. (R. 76). He stated that after getting on the right medicine his condition is not greatly impacted by the weather but prior to his diagnosis he was more affected. (R. 79).

## D.    Vocational Evidence

Also testifying at the hearing was Linda Dezack, an impartial vocational expert. (R. 83). Ms. Dezack characterized Plaintiff's past work as a federal court clerk as low skilled and at the

sedentary level. (R. 84). Ms. Dezack classified the head coach position as high skilled, customarily preformed as heavy but actually performed as light. (R. 85).

With regard to Plaintiff's ability to return to her prior work, Ms. Dezack gave the following responses to the ALJ's hypothetical:

Q:      [A]ssume that this individual is limited to light work except the work is with occasional posturals except no crawling or climbing of ladders, ropes, or scaffolds. Can the hypothetical individual perform either of the past jobs you described as actually performed or generally performed in the national economy?

A:      Is there a skill level involved?

Q:       There's no limitation on the skill level.

A:      Yes. The individual would be able to perform the federal court clerk's occupation as it is sedentary in nature both as performed in the national economy as well as actually performed.

        Let me add, however…the head coach occupation would not fit that hypothetical as it would require frequent postural motions, activities.

(R. 84-85).

Incorporating the above hypothetical, the ALJ then questioned Ms. Dezack regarding Plaintiff's ability to perform other work with additional limitations:

Q:      For the second hypothetical add the additional limitations of no exposure to extreme cold and no concentrated exposure to extreme heat, wetness, vibration and hazards such as unprotected heights and moving mechanical parts. Can the hypothetical individual perform any of the past jobs as you've described as actually performed or generally performed in the national economy?

A:      Based upon the hypothetical, the individual would be able to perform the federal court occupation…based upon how it's performed in the national economy, not as how it's actually performed as based upon the testimony. The individual is required to travel which would expose that person to temperature changes, climate changes.

Q:      …the limitation was no exposure to extreme cold in the second hypothetical along with no concentrated exposure to extreme heat and wetness is the part I believe that you're referring to. So it's your opinion that those limitations would prohibit business travel; is that correct?

A:      Mr. Edgell had mentioned that he travels with the judges which would expose him to temperature changes getting in and out of the car from the office or the hotel. You're asking me about temperature – you're asking me about exposure to coldness, heat. As performed, as actually performed, he would be exposed to those elements.

Q:      Okay. But actually the description was extreme cold and extreme heat.

A:      Yes. He would be exposed to extreme cold and heat when he does travel.

Q:      Okay.

A:      But not as nationally performed as there would be no exposure. He would be in a temperature-controlled environment.

Q:      Okay.

(R. 86-87). The VE further explained that in unskilled work, an employee may be permitted to be off task ten percent of the time, but for skilled work in a salaried position there is more liberty to be off task up to twenty percent as long as job duties are completed. (R. 87). The VE testified that for unplanned, unexcused absences most employers tolerate up to eight days of annual absences or less than half a day per month. (R. 88). As for breaks in skilled jobs, the VE stated there are typically no scheduled breaks but a meal break for a half hour to an hour is typically allowed and an individual may take breaks as needed, not to exceed the amount of time permitted by their manager. (Id.).

Plaintiff's attorney questioned Ms. Dezack further regarding the permissible amount of time to be off task in a skilled position. (R. 89-90). Next, the VE clarified that based on hypothetical number two presented by the ALJ, the individual would not be able to perform the job as federal court clerk as it was performed because the position exposed him to temperature extremes. (R. 90).

25

However, the VE explained that the individual would be able to perform the job as customarily performed nationally as that individual would be indoors. (Id.).

**E.     SSA Reports & Forms: Report of Contact & Work History Reports**

Plaintiff completed a Work History Report in which he described his position as a federal law clerk as a management position that required using machines, tools and equipment, applying technical skills and knowledge, completing writing and reports and managing/supervising employees. (R. 205). He had to walk for one hour, stand for two hours, sit for three hours and write/type for two hours. (Id.). The heaviest weight lifted was less than ten pounds. (Id.).

A report of contact form dated June 8, 2011 stated that Plaintiff was limited to light exertional work with postural and environmental limitations. (R. 207). Plaintiff's past work as a federal court clerk/manager was classified as sedentary and described as light/sedentary by Plaintiff (i.e., stand/walk three hours per day, lifting less than ten pounds, no postural requirements). (Id.). Plaintiff was found to be able to perform past work as described and as performed in the national economy. (Id.). A report of contact form dated September 9, 2011 noted that Plaintiff's RFC had not changed. (R. 233). The form noted a review of the vocational analysis from the initial claim and agreed that Plaintiff could perform his past work as described. (Id.).

**F.     Lifestyle Evidence**

On an adult function report dated June 3, 2011, Plaintiff stated that his conditions impact his ability to work due to continual pain, swollen joints and limited mobility, which happens mostly during flare-ups. (R, 195). As for his typical day, Plaintiff stated he wakes up, stretches and goes for a walk, does personal care, eats, goes to campus to complete coaching duties, eats, usually shops or visits places, naps, if he is feeling okay he golfs or chips/putts, then eats, watches television and reads. (Id.). Prior to the onset of his conditions, Plaintiff noted that he was very

active, including working out and golfing. (Id.). His conditions affect his sleep as the pain keeps him awake at night or wakes up in the middle of the night. (Id.).

Plaintiff stated that he had no problem with personal care and no problem preparing meals but he only does limited cooking. (R. 197). As for household chores, he completes a small amount of cleaning and household repairs, which takes about two hours a week. (Id.). He has a person who cleans his apartment and does his laundry. (Id.). He has not been able to do yard work, which is minimal, because of his swollen hands. (R. 197-98). He goes outside often and is able to walk and drive a car but noted that during flare-ups driving is difficult because of painful, swollen hands and wrists. (R. 198). As for shopping, Plaintiff stated he seldom shops for groceries, approximately twice a month, and the trips take about one hour. (Id.). His hobbies include watching television, walking, golfing, reading and exercising. (R. 199). When there is pain or swelling, he is limited from physical activities. (Id.). His ability to walk and golf is limited, particularly during flare-ups; he stated that he has stopped exercising, walking and golfing completely for up to a few months. (Id.). As for social activities, Plaintiff reported that he visits with others about four times a week and he attends sporting events, restaurants and Davis and Elkins campus on a regular basis. (Id.).

His conditions affect his ability to: lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs and use his hands. (Id.). Plaintiff reported that he has generally experiences these limitations because of painful and swollen joints. (Id.). He noted that as the swelling decreases, his activity improves but when he has a flare-up, he is completely limited. (Id.). He is able to walk one to two miles if he is not in pain and sometimes needs to rest for five to ten minutes before walking. (Id.). He has no problem paying attention, following instructions or handling stress. (Id.). In closing, Plaintiff stated that during flare-ups, he is seriously affected by rheumatoid arthritis and explained that most recently, he experienced a flare-up that lasted six months. (R. 202). He is feeling better

27

following the flare-up but still has pain and swelling in his joints, which is manageable with medication. (Id.).

On June 3, 2011, Plaintiff also completed a Personal Pain Questionnaire. (R. 209-11). He stated that he always has pain, which is most severe during flare-ups. (R. 209). Plaintiff described the pain as continuously aching, stabbing, cramping and throbbing. (Id.). During flare-ups, Plaintiff said he is immobile and in pain but at other times, he can live "pretty normal" with the pain. (Id.). Cold weather makes the pain and swelling worse. (Id.). His pain is relieved by using medicine, medical assistance such as therapy and exposure to warm weather. (Id.). His medications include Methotrexate, Aleve and Enbrel and he did not report side effects. (Id.). Plaintiff stated that his rheumatoid arthritis severely affects him during the flare-ups, which were occurring about six to seven months a year. (R. 211). He stated that medicine seems to help the pain but the medication does not eliminate the flare-ups. (Id.). He noted that the flare-ups limit him from having a normal life and are very painful. (Id.).

On a second adult function report dated August 26, 2011, Plaintiff reported that the pain and swelling in his joints affect everything he does. (R. 221). On most occasions, he cannot do any work or activities that requires more than normal physical activity, such as lifting, walking up/down stairs and so forth. (Id.). He is limited to minor movement when he experiences a flare-up. (R. 221-22). He continually has moderate to severe pain and swelling in his joints, including his hands, elbows, showers, knees and ankles/feet. (R. 222). He stated that he makes all of his "plans around the activity of the disease." (Id.). Plaintiff reported similar information regarding his daily activities as outlined in his first adult function report. However, he now noted difficulty dressing and that buttons and zippers were hard to manage. (R. 223). He stated swelling and pain in his hands make it too difficult to do household chores such as ironing or yard work such as

mowing. (R. 224). He noted that he still goes shopping for essentials about once a week for one

hour. (R. 225). As for activities, he golfs, eats out and attends social events when able. (R. 226).

In regard to limitations on his abilities, Plaintiff listed the same limitations as before but added

difficulty completing tasks. (R. 227). He also noted that he can now only walk half a mile before

needing to stop and rest; however, he further stated that his walking was getting to the point where

he is not in as much pain. (Id.).

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or
mental impairment or impairments are of such severity that he is not only unable to
do his previous work but cannot, considering his age, education, and work
experience, engage in any other kind of substantial gainful work which exists in the
national economy, regardless of whether such work exists in the immediate area in
which he lives, or whether a specific job vacancy exists for him, or whether he
would be hired if he applied for work…'[W]ork which exists in the national
economy' means work which exists in significant numbers either in the region
where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step

sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing
substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If
you do not have a severe medically determinable physical or mental impairment
that meets the duration requirement . . . or a combination of impairments that is
severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s).
If you have an impairment(s) that meets or equals one of our listings . . . and meets
the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is
evaluated based "on all the relevant medical and other evidence in your case record
. . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## V.   ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1.   **The claimant meets the insured status requirements of the Social Security Act at least through June 30, 2015. (Exhibit 2D).**

2.   **The claimant has not engaged in substantial gainful activity since August 31, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*).**

3.   **Since August 31, 2009, the claimant has had the following medically determination impairments that, either individually or in combination, are "severe" and have significantly limited his ability to perform basic work activities for a period of at least 12 consecutive months: Systemic Lupus Erythematosus; "Non-Severe" Hypertension; "Non-Severe" GERD/Diverticulosis; "Non-Severe" Arteriosclerosis; "Non-Severe" Vitamin D insufficiency; and "Non-Severe" Hyperuricemia. (20 CFR 404.1520(c)).**

4.   **Since August 31, 2009, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).**

5.   **Since August 31, 2009, the claimant has had only the residual functional capacity to perform a range of work activity that: requires no more than a "light" level of physical exertion; entails no crawling or climbing of ladders/ropes/scaffolds and no more than occasional performance of**

other postural activities; **entails no exposure to cold temperature extremes; and no concentrated exposure to hot temperature extremes, wet conditions, vibrations, and hazards (e.g., unprotected heights, moving mechanical parts) (20 CFR 404.1567(b).**

6. **The claimant is capable of performing past relevant work as a Federal Court Clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).**

7. **The claimant has not been under a disability, at any time, as defined in the Social Security Act, from August 31, 2009, through the date of this decision (20 CFR 404.1520(g)).**

(R. 31-41).

## VI.   DISCUSSION

### A.   Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (citing Laws, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th

31

Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

**B.      Contention of the Parties**

Plaintiff, in her Motion for Summary Judgment, asserts that the Commissioner's decision "is based upon an error of law and is not supported by substantial evidence." (Pl.'s Mot. at 1). Specifically, Plaintiff alleges that:

- The Appeals Council erred in failing to consider new and material evidence.

- The ALJ erred in finding Plaintiff to be not credible.

- The ALJ erred in finding Plaintiff could perform light exertional work by assigning significant weight to a non-examining physician, which contradicted the opinion of Plaintiff's treating physicians.

(Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at 2-5, ECF No. 10-1). Plaintiff asks the Court to reverse the Commissioner's decision. (<u>Id.</u> at 5).

Defendant, in her Motion for Summary Judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1). Specifically, Defendant alleges that:

- The Appeals Council properly found that Plaintiff's post-hearing evidence was from a later time and did not provide a basis for changing the ALJ's decision.

- The ALJ properly assessed Plaintiff's credibility.

- The ALJ properly relied on the expert opinion of the state agency physician to find that Plaintiff was capable of light exertional work.

(Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 6-14, ECF No. 24).

**C.** **Analysis of the Administrative Law Judge's Decision**

    **1.** **Whether the Appeals Council Properly Found Plaintiff's Post-Hearing Evidence Was Not New and Material Because it Related to a Time After the ALJ's Decision**

Social Security Regulations permit a claimant to submit additional evidence when requesting review by the Appeals Council. 20 C.F.R. § 416.1470(b). The Appeals Council must first decide "if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." Wilkins v. Sec'y, Dep't of Health and Human Servs., 953 F.2d 93, 96 (4th Cir. 1991) (citing Williams v. Sullivan, 905 F.2d 214, 216 (8th Cir. 1990)); see also 20 C.F.R. § 404.970. Evidence is new if it is not "duplicative or cumulative." Wilkins, 953 F.2d at 96. "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." Id. In determining whether evidence relates back, "this Court has held that medical evaluations made subsequent to the expiration of a claimant's insured status are not automatically barred from consideration and may be relevant to prove a previous disability." Wooldridge v. Bowen, 816 F.2d 157, 160 (4th Cir. 1987).

Then, the Appeals Council then must evaluate the entire record, including the new and material evidence. See 20 C.F.R. § 404.970(b). After evaluating the record, the Appeals Council will only grant the request for review "if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record." Id. § 404.970. "[I]f upon consideration of all of the evidence, including any new and material evidence, the Appeals Council finds the ALJ's action, findings, or conclusions *not* contrary to the weight of the evidence, the Appeals Council can simply deny the request for review." Meyer v. Astrue, 662 F.3d 700, 705 (4th Cir. 2011) (emphasis added). If the Appeals Council rejects the request for review, the Appeals Council is not required to explain its analysis or rationale in denying the request. See Id. at 702.

The Fourth Circuit has noted that "an express analysis of the Appeals Council's determination would [be] helpful for purposes of judicial review," but such an analysis is not required. Id. (quoting Martinez v. Barnhart, 444 F.3d 1201, 1207-08 (10th Cir. 2006)). After the Appeals Council considers the new and material evidence, the evidence is incorporated into the record. Thus, the reviewing court "must review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the Secretary's findings." Wilkins, 953 F.2d at 96.

Plaintiff argues that the Appeals Council rejected new evidence submitted because it related to a "later time." (Pl.'s Br. at 5). Plaintiff asserts this new evidence includes reports from Dr. Kafka, his treating rheumatologist, a RFC assessment by Dr. Chua, his treating primary care physician, and from Elkins Physical Therapy, his treating therapy provider. (Id.). Plaintiff argues that while the evidence post-dates the ALJ's decision, the reports relate back to the treatment provided during the period at issue. (Id.).

Defendant argues that the Appeals Council correctly considered the additional medical records from Dr. Kafka and Dr. Chua and determined that the records did not provide a basis for changing the ALJ's decision and that the physical therapist's records related to a period of time outside the disability period in question. (Def.'s Br. at 12). First, Defendant argues that Dr. Chua's assessment does not relate back to the disability period. (Id.). Second, Defendant argues that even if Dr. Chau's assessment relates back, his opinion is contradicted by the record so that "the substantial evidence in the record significantly outweighs" Dr. Chua's opinion. (Id. at 13). As such, the "Appeals Council's was correct in deciding that it did not render the ALJ's decision contrary to the weight of the evidence." (Id.). Next, Defendant argues that Dr. Kafka refused to give a functional evaluation so the Appeals Council "properly found that it did not provide a basis for

overruling the ALJ's decision." (Id.). Finally, Defendant argues that "the physical therapy report came from a non-acceptable medical source and therefore could not be dispositive even if it had been presented to the ALJ." (Id.). Defendant further asserts that report was just a one-time assessment of Plaintiff's physical function performed on a specific day months after the period at issue and therefore, was outside the relevant period of disability. (Id.).

In the present case, the new evidence presented to the Appeals Council includes: 1) Medical Source Statement by Dr. Chua; 2) Medical Source Statement by Dr. Kafka; and 3) Functional Capacity Evaluation by Physical Therapy John DiBacco.

### a. Dr. Catherine Chua, May 28, 2013, Lupus (SLE) Medical Source Statement

On April 10, 2013, Dr. Chua, Plaintiff's treating physician, completed a Lupus (SLE) Medical Source Statement regarding Plaintiff's impairments. (R. 508-12). Dr. Chua listed objective signs of Plaintiff's impairments, including: malar rash (over the cheeks), arthritis involving pain, tenderness, swelling and effusion in more than one joint, severe fatigue, respiratory system problems (i.e., pleuritic) and inflammatory arthritis. (R. 508-09). Dr. Chua found moderate functional limitations for activities of daily living, maintaining social functioning and completing tasks in a timely manner due to deficiencies in concentration, persistence or pace. (R. 509). Dr. Chua noted that Plaintiff's prognosis was good and his impairments were expected to last twelve months. (R. 510).

As for functional limitations, Dr. Chua found Plaintiff could walk three city blocks before needing to rest, could sit for thirty minutes at one time before needing to get up, could stand for fifteen minutes at one time before needing to sit down or walk around, and could sit and stand/walk for a total of about four hours in an eight-hour work day. (Id.). She noted that Plaintiff would need a job that permitted shifting positions at will from sitting, standing or walking. (Id.). Plaintiff would

sometimes need to take unscheduled thirty minute breaks every two hours during the work day, in which he could lie down. (Id.).

Dr. Chua limited Plaintiff to never lifting or carrying fifty pounds, rarely carrying twenty pounds (i.e., one to five percent of an eight hour day) and occasionally carrying ten pounds and less than ten pounds (i.e., six to thirty-three percent of an eight hour day). (R. 511). She found Plaintiff could never climb ladders, rarely climb stairs, occasionally stoop (bend), occasionally crouch/squat and frequently twist. (Id.). For environmental restrictions, Dr. Chua found no restrictions on exposure to perfumes, soldering fluxes or solvents/cleaners but recommended Plaintiff avoid concentrated exposure to high humidity and wetness and to avoid even moderate exposure to extreme cold, extreme heat, cigarette smoke, fumes, odors, gases, dust and chemicals. (Id.). Dr. Chua noted that Plaintiff would likely be "off task" twenty-five percent or more of the time and would be incapable of even "low stress" work because that is the reason he needed to resign from his job. (R. 512). She noted that Plaintiff's impairments were likely to produce good and bad days. (Id.). She further stated that if working full time, Plaintiff would likely be absent from work as a result of his impairments more than four days per month. (Id.).

The undersigned finds that the Appeals Council properly incorporated Dr. Chua's Lupus Medical Source Statement into the record as new and material evidence that relates back to the period of disability. The assessment is new because Dr. Chua's opinion as to Plaintiff's functional limitations is not included elsewhere in the record. The opinion is material because Dr. Chua treated Plaintiff every three months for ten years and treated Plaintiff's many conditions, including rheumatoid arthritis and then lupus, as well as hypertension, GERD, hyperlipidemia and gonadal dysgenesis. (R. 508). The opinion lists specific symptoms associated with Plaintiff's lupus diagnosis as well as Dr. Chua's opinion as to Plaintiff's functional limitations. (R. 508-12). As

such, the statement might reasonably have changed the ALJ's conclusion that Plaintiff was not

disabled if the ALJ had considered the additional limitations as recommended by Plaintiff's long-

standing treating physician. Additionally, while the letter is dated April 10, 2013, after the issuance

of the ALJ's decision, the letter relates back to Plaintiff's medical condition prior to the rendering

of the ALJ's decision. Dr. Chua treated Plaintiff's conditions during the relevant period of time

and the assessment is consistent with Plaintiff's symptoms and diagnoses reported during the

period of disability.

Next, the Court must review the entire record, including the new evidence, "in order to

determine whether substantial evidence supports the Secretary's findings." Wilkins, 953 F.2d at

96. The Fourth Circuit noted that a court "cannot determine if findings are supported by substantial

evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence."

Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). Indeed:

> [t]he courts . . . face a difficult task in applying the substantial evidence test when
> the Secretary has not considered all relevant evidence. Unless the Secretary has
> analyzed all evidence and has sufficiently explained the weight he has given to
> obviously probative exhibits, to say that his decision is supported by substantial
> evidence approaches an abdication of the court's "duty to scrutinize the record as a
> whole to determine whether the conclusions reached are rational."

Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977); see also 20 C.F.R.

§ 404.1527 ("[ALJs] will always give good reasons in our notice of determination or decision for

the weight we give your treating source's opinion."). The ALJ is entitled to give controlling or

great weight to the opinion of the treating physician. See 20 C.F.R. § 404.1527(d)(2) (providing

that a treating physician's opinion is entitled to deference). "In view of the weight afforded the

opinion of a treating physician, analysis from the Appeals Council or remand to the ALJ for such

analysis would be particularly helpful when the new evidence constitutes the only record evidence

as to the opinion of the treating physician." <u>Meyer</u>, 662 F.3d at 706. In finding that the new evidence required remand in <u>Meyer</u>, the court explained that the evidence filled an "evidentiary gap" in the record before the ALJ. <u>Id.</u> at 707. The court further found that the "other record evidence credited by the ALJ conflicts with the new evidence." <u>Id.</u>

Based on a careful review of the record as a whole, including the new and material evidence, the undersigned cannot determine whether substantial evidence still supports the ALJ's decision in light of Dr. Chua's treating source opinion. First, Dr. Chua's opinion fills an evidentiary gap in the record before the ALJ. The record before the ALJ did not include any opinions from Plaintiff's treating physicians regarding Plaintiff's limitations. Dr. Chua maintained a longitudinal relationship with Plaintiff for over ten years and treated many of Plaintiff's conditions. (R. 508). Moreover, Dr. Chau's assessment provides evidence of greater limitations than previously presented to the ALJ. As such, Dr. Chua's assessment fills an evidentiary gap in the record.

Second, Dr. Chua's opinion regarding Plaintiff's limitations conflicts with evidence credited by the ALJ. For example, the ALJ accorded significant weight to the State Agency Medical Consultant opinion (R. 39), but Dr. Chua's assessment recommended greater limitations than those contained in the State Agency opinion (R. 510-12). Dr. Chua limited Plaintiff to only occasionally lifting ten pounds or less and also found greater postural limitations. (R. 511). Dr. Chua also recommended a sit/stand option that would allow Plaintiff to sit for thirty minutes at one time, stand for fifteen minutes at a time and sit and stand/walk for no more than four hours total in a work day. (R. 510). The State Agency opinion as well as the ALJ's hypothetical questions to the VE did not address a sit/stand option and the ALJ did not account for a sit/stand option in Plaintiff's RFC. Dr. Chua further opines that Plaintiff requires unscheduled breaks twice a day for as long as thirty minutes for him to lie down before returning to work. (R. 510). He also found that

Plaintiff would likely be off task twenty-five percent or more and would miss more than four days of work per month because of his conditions. (R. 512). Again, the ALJ did not consider these proposed limitations as recommended by a treating physician when formulating his RFC. In sum, Dr. Chua's assessment conflicts with the evidence credited by the ALJ as the opinion includes greater and new limitations on Plaintiff's ability to work.

Based on the foregoing, the undersigned cannot determine whether the ALJ's decision is supported by substantial evidence. The record before the ALJ did not include any treating source opinions regarding Plaintiff's limitations. Dr. Chua's opinion included greater, and contrary, limitations than those opined by the State Agency physician and in the RFC ultimately adopted by the ALJ. Given the deference entitled to a treating source opinion and because the record before the ALJ did not include any treating source opinions, the undersigned cannot determine whether substantial evidence supports the ALJ's decision. See Meyer, 662 F.3d at 707 (remanding the case because "no fact finder has made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record."). The undersigned cannot undertake the responsibility of assessing the probative value of Dr. Chua's assessment or determining the weight the opinion is entitled, a task which must be completed by a fact finder. See Id. ("[a]ssessing the probative value of competing evidence is quintessentially the role of the fact finder. We cannot undertake it in the first instance."). Dr. Chua's assessment conflicts with other evidence in the record credited by the ALJ and fills an evidentiary gap because no treating source opinion was previously in the record. Accordingly, remand is required to determine the weight accorded to the treating source opinion and whether the ALJ's opinion is supported by substantial evidence.

By reaching the conclusion that substantial evidence does not support the ALJ's decision,

the undersigned does not make any finding regarding whether Plaintiff's medically determinable impairments, alone or in combination with his other impairments, are disabling, and what, if any, functional limitations they might cause, or if the impairments, alone or in combination with his other impairments, meet the durational requirement.

### b. Dr. Kafka, April 10, 2013, Lupus (SLE) Medical Source Statement

In the April 10, 2013 Lupus (SLE) Medical Source Statement, Dr. Kafka, Plaintiff's treating rheumatologist, noted objective findings related to Plaintiff's lupus symptoms, such as joint pain and tenderness in his hands and feet, severe fatigue and occasional flares of joint pain. (R. 502-03). Dr. Kafka also noted Plaintiff had inflammatory arthritis, at least to a moderate degree. (R. 503). She further stated that Plaintiff's prognosis was stable and that his impairments were expected to last at least twelve months. (R. 504). As for functional limitations, Dr. Kafka noted that a functional capacity evaluation should be completed by a physical therapist. (Id.).

The undersigned finds that the Appeals Council properly considered Dr. Kafka's Lupus Medical Source Statement to be new and material evidence that relates back to the period of disability. The letter includes Plaintiff's treating specialist's opinion as to Plaintiff's lupus condition, including the specific symptoms as well as his prognosis. A medical source statement from Dr. Kafka describing Plaintiff's symptoms was not previously included in the record. Even though the report was completed following the ALJ's decision, there is no indication that the report did not relate back to the period of disability. Dr. Kafka treated Plaintiff for lupus during the relevant period of time and the Statement is consistent with symptoms Plaintiff reported during the period of disability.

However, the undersigned also agrees with the Appeal Council that the ALJ's findings are not contrary to the weight of the evidence currently of record, including the newly submitted

assessment from Dr. Kafka. See 20 C.F.R. § 404.970. The medical evidence before the ALJ included multiple reports of Plaintiff's symptoms related to joint pain, fatigue and flare-ups; the ALJ considered these symptoms as well as Plaintiff's lupus diagnosis when formulating the RFC and finding that Plaintiff could return to his past relevant work. Dr. Kafka's assessment identifying these symptoms in association with Plaintiff's lupus diagnosis is not contrary to the ALJ's findings regarding Plaintiff's impairments. Unlike Dr. Chua's assessment, Dr. Kafka does not include work-related limitations associated with Plaintiff's conditions not previously included in the record before the ALJ. Accordingly, the new report by Dr. Kafka does not render the ALJ's action, findings or conclusion contrary to the weight of the evidence as a whole. However, because the undersigned is already recommending remand for consideration of Dr. Chua's assessment, the undersigned further recommends that on remand the Commissioner consider and weigh Dr. Kafka's Medical Source Statement as a treating source opinion.

### c. Functional Capacity Evaluation, John DiBacco, PT, DPT, Elkins PT and Sports Injury Clinic, June 15, 2013

On June 15, 2013, John DiBacco completed a Functional Capacity Evaluation of Plaintiff after he was referred by his treating physician, Dr. Chau. (R. 15-18). Mr. DiBacco found Plaintiff could perform lifting at the light physical demand level for an eight hour day with significant restrictions on his ability to tolerate repetitive material handling or prolonged activity. (R. 15). Dr. DiBacco opined that due to these restrictions, Plaintiff "could be classified as unable to work unless significant job modifications could be made." (Id.).

The Appeals Council did not consider the physical therapy report and it was not incorporated into the record because the report "is about a later time." (R. 3). Unlike Dr. Kafka's and Dr. Chua's Medical Source Statements that involve their assessment of Plaintiff's medical

condition diagnosed and treated by them during the relevant time period of disability, the evaluation that formed the basis for the physical therapy report was performed on June 11, 2013, five months after the issuance of the ALJ's decision. The evaluation involved an assessment of Plaintiff's condition at this particular period of time. Accordingly, the undersigned finds that the Appeals Council did not error in determining that the physical therapy report relates to a time after the period of disability and the report was appropriately excluded from the record.

## 2. Whether the ALJ Properly Assessed Plaintiff's Credibility

Plaintiff also argues that the ALJ erred in considering Plaintiff's credibility. The determination of whether a person is disabled by pain or other symptoms is a two-step process. See Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1); SSR 96-7p, 1996 WL 374186 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medial evidence an impairment capable of causing the degree and type of pain alleged. See Craig, 76 F.3d at 594. Second, once this threshold determination has been made, the ALJ considers the credibility of her subjective allegations of pain in light of the entire record. Id.

Social Security Ruling 96-7p sets out some of the factors used to assess the credibility of an individual's subjective symptoms, including allegations of pain. Some of the factors include: the individual's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; any medication taken to alleviate pain or symptoms; and treatment and other measures used to relieve symptoms. See SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). The ALJ must do more than "recite the factors that are described in the regulations for evaluating symptoms." Id. Rather, the decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the

individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. at *2. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984). This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." Ryan v. Astrue, No. 5:09CV55, 2011 WL 541125, at *3 (N.D.W. Va. Feb. 8, 2011) (Stamp, J.). If the ALJ meets his basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D.W. Va. February 3, 2010) (Seibert, Mag.) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

Here, the ALJ found the credibility of Plaintiffs subjective allegations to be "tarnished" and "substantially undermined" following a thorough evaluation of the evidence of record. (R. 35). Plaintiff argues that the ALJ erred in finding Plaintiff to be less than credible. (Pl.'s Br. at 2). Plaintiff states that the ALJ "mostly focused" on his "truthful testimony that he tries to stay active by playing some golf." (Id. at 3). However, Plaintiff argues that the record supports Plaintiff's reports of symptoms associated with his conditions, which include "variations in the intensity, duration and location of pain." (Id.). Plaintiff further states that the record shows consistent, regular medical treatment with his primary care physician and rheumatoid specialist from May 2009 through October 2012, during which he relayed these symptoms to his physicians. (Id. at 3-4). Moreover, during seventeen of the thirty-four visits, he complained of pain, swelling and other symptoms, which affirms Plaintiff's testimony that he has "good days" and "bad days." (Id. at 4).

Defendant argues that in making his credibility determination, the ALJ properly considered Plaintiff's daily activities, his ongoing work as a golf coach and his overall active lifestyle. (Def.'s

Br. at 7-8). Defendant further states that the ALJ's decision was also supported by medical records, which were inconsistent with Plaintiff's complaints of disabling pain. (Id. at 8). Moreover, Defendant noted that once Plaintiff was correctly diagnosed with lupus and began receiving the appropriate medication, "his symptom flare-ups were reduced" and the occasional flare-ups were "less painful than they had been previously." (Id. at 9).

The undersigned finds that the ALJ's credibility determination as outlined in his decision was "sufficiently specific to make clear" the ALJ's reasoning in finding Plaintiff not fully credible. The ALJ cited to Plaintiff allegations as presented in his Adult Function Reports as well as his testimony during the administrative hearing. (R. 35). The ALJ then pointed to Plaintiff's ongoing work as a golf coach, his daily activities and his improvement with medical treatment. (Id.). The ALJ also provided a thorough overview of Plaintiff's medical records in support of his finding that Plaintiff's allegations were inconsistent with the medical evidence. (R. 36-37). However, because the undersigned recommends remanding the case for the reasons stated above, the Court further recommends that on remand the Commissioner reassess Plaintiff's credibility in light of the entire record, including the new and material evidence from Plaintiff's treating physicians.

**3.      Whether the ALJ Properly Relied on the State Agency Physician's Opinion**

Plaintiff argues that the ALJ rejected the documentation of Plaintiff's symptoms by his treating physician and instead relied upon a single opinion by a non-examining physician, Dr. Franyutti. (Pl.'s Br. at 4). Plaintiff notes the brevity of Dr. Franyutti's assessment and that he is listed as a pathologist specialist. (Id.). He further states that Dr. Franyutti was affirming the June 8, 2011 assessment of a non-physician SDM, Ferdad Roidad, and the opinion of a SDM is not entitled to evidentiary weight. (Id.). Plaintiff concludes that this "deficiency cannot be remedied by a one-sentence affirmation by someone with a medical degree." (R. 4-5).

Defendant argues that the ALJ properly considered all of the evidence in the record and decided to give Dr. Franyutti's opinion greater weight because it was consistent with this evidence. (Def.'s Br. at 10). Defendant states that is was proper for Dr. Franyutti to review the record and then "affirm the prior assessment as written," which found Plaintiff capable of a range of light work with postural and environmental limitations. (Id.). Defendant explains that "Dr. Franyutti's review of the file in the reconsideration stage made the same residual functional capacity finding [as the SDM] even in light of the updated evidence. (Id.). While it would have been improper for the ALJ to rely on the non-physician's assessment, Defendant argues the ALJ did not and instead properly relied on Dr. Franyutti's opinion. (Id. at 11).

Both parties agree that it is impermissible for an ALJ to rely on the opinion of a non-physician SDM. See Morgan v. Colvin, 531 F. App'x 793, 794-95 (9th Cir. 2013) ("An ALJ may not accord any weight, let alone substantial weight, to the opinion of a non-physician SDM.") (citing Program Operations Manual System DI 24510.050 ("SDM-completed forms are not opinion evidence at the appeal levels.")); Dewey v. Astrue, 509 F.3d 447, 449 (8th Cir. 2007) (finding that the ALJ erred by crediting the RFC assessment of a non-physician in reaching the determination that the plaintiff could perform light work.); Coggins v. Astrue, No. 1:09CV405, 2011 WL 815269, at *2 (W.D.N.C. Jan. 28, 2011) (holding that the case "requires remand as mistaking the conclusion of a lay employee of the Commissioner for that of a physician is so fundamental as to undermine confidence in the process as well as the outcome if left uncorrected."); Nicholson v. Astrue, No. 1:09CV271, 2010 WL 4506997, at *6 (W.D.N.C. Oct. 29, 2010) (stating that a "SDM is not a medical professional of any stripe, and a finding from such an individual is entitled to no weight as a medical opinion, or to consideration as evidence from other non-medical sources.").

In the present case, the ALJ did not rely on the decision of the non-physician SDM in formulating Plaintiff's RFC. Instead, the ALJ relied on Dr. Franyutti's medical opinion, which affirmed the SDM's RFC assessment following his review of the medical evidence. Another district court in this Circuit has held "that an ALJ may properly allocate weight to the opinion of a medical source who affirms the Assessment of an SDM after reviewing all of the record evidence." Bays v. Colvin, No. 2:14-CV-01564, 2015 WL 769784, at *22 (S.D.W. Va. Feb. 23, 2015). Here, Dr. Franyutti's assessment states in its entirety: "I reviewed the medical evidence in the case file including new MERs & ADLs, all considered & assessment of 6/08/2011 is affirmed as written." (R. 401). While brief, Dr. Franyutti clearly states he reviewed the updated medical evidence of record in making his assessment. (Id.). Moreover, another Northern District of West Virginia case held that an ALJ's reliance on an RFC authored by a SDM and affirmed by a state agency physician after review of the evidence is permissible. See Lamp v. Astrue, No. CIV. A. 3:07 CV 130, 2009 WL 412884, at *14 (N.D.W. Va. Feb. 18, 2009). In Lamp, a non-physician SDM completed a physical RFC assessment and then Dr. Franyutti reviewed the record and similarly affirmed the SDM's RFC in a brief assessment. Id. In the ALJ's decision, he relied on the RFC as affirmed by Dr. Franyutti. Id. In his adopted report and recommendation, Magistrate Judge Kaull concluded that the ALJ properly relied on the RFC prepared by a SDM and then affirmed by Dr. Franyutti after a review of the record. Id. In the present case, the ALJ relied on Dr. Franyutti's assessment, not the SDM's RFC. (R. 39). Moreover, Dr. Franyutti stated he reviewed and considered the updated medical evidence and activities of daily living in making his assessment to affirm the SDM's RFC. (R. 401). Accordingly, the undersigned finds that there was no error in the ALJ crediting the state agency medical consultant's opinion, even though it affirmed a non-physician SDM assessment.

46

Furthermore, "administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence…" <u>See</u> 20 C.F.R. § 404.1527(e)(2)(i). As such, the ALJ properly considered and weighed Dr. Franyutti's medical opinion as the State Agency Medical Consultant. (R. 39). The ALJ accorded "significant weight" to the Dr. Franyutti's assessment, which affirmed the SDM's RFC assessment limiting Plaintiff to a light physical exertional capacity with other postural and environmental limitations. (R. 39). The ALJ explained that Dr. Franyutti's opinion was consistent with the full longitudinal record as well as balanced and objective. (R. 39). He also emphasized that even though Dr. Franyutti was not an examining physician, he had prepared the assessment after a thorough review of the record. (<u>Id.</u>). The ALJ also credited the expert's familiarity with the SSA disability evaluation program. (<u>Id.</u>). The undersigned finds this explanation sufficiently specific to allow the undersigned to determine the weight and reason for the weight given to the assessment. However, the undersigned recommends remanding the case for consideration of Dr. Chua's treating source opinion as explained above. Accordingly, the Court further recommends that on remand the Commissioner reassess the weight and reason for the weight assigned to the State Agency opinion particularly in light of the conflicting limitations opined by Plaintiff's treating physician.

## VII.    <u>RECOMMENDATION</u>

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is not supported by substantial evidence. Accordingly, I **<u>RECOMMEND</u>** that Plaintiff's Motion for Summary Judgment (ECF No. 10) be **GRANTED**, Defendant's Motion for Summary Judgment (ECF No. 24) be **DENIED**, and the decision of the Commissioner be reversed and this case be

**REMANDED** for further proceedings consistent with this Recommendation and this matter be dismissed from the Court's active docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Gina M. Groh, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 4th day of May, 2015.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE